is here to help us. He is a graduate of the Naval Academy and served as an aviator. He is a graduate of Vanderbilt Law School and was appointed to the bench in 1983 by President Reagan. He has served in the Northern District with distinction ever since, so we're very, very glad that he's here with us. I think you're all familiar with our lighting system. When the yellow light goes on, that means your time is drawing to a close, so begin to wrap up. If we take you beyond the red light, then don't worry. Just keep talking to us, and you're on our time and not yours. With that, we'll start with our first case, and that is 14-15294, United States v. Enkeleon Manati. And if I didn't pronounce it correctly, you can let me know. Mr. Johnson, Mr. Johnson. May it please the Court. My name is Jess Johnson, and I represent the appellant Enkeleon Manati. Mr. Manati was indicted and charged for attempting to smuggle two Albanian nationals, Daniel Jura and Majlin Marku, into the United States through the Atlanta airport in April of 2013. They were also arrested at that time, Matrona Kulga, a Greek citizen and a known alien smuggler. Everyone here agrees that Ms. Kulga tried to get these two Albanian nationals into the country legally. The question at trial, of course, was, was Mr. Manati somehow involved? The jury only convicted Mr. Manati on trying to smuggle in Daniel Jura. They, the jury acquitted him of trying to smuggle in Majlin Marku. And in our brief, we've raised He was also convicted of the conspiracy, though, right? Yes, Your Honor, and a conspiracy count. We've raised several evidentiary errors that occurred at trial that we contend swayed the jury in its verdict. The first error I'd like to talk about today are the jail phone calls that Kulga made after she was arrested. She made several jail phone calls to a gentleman by the name of Vasily Budo, as well as Mr. Manati's wife. And in these phone calls, she claims, to say anyway, that she asked for $5,000 and in exchange, she would enter a plea of guilty and that Mr. Manati would go free. Now, this all came in through cross-examination. These jail phone calls were not tendered into evidence, but the government was reading from a transcript. So it was clear to everyone in the courtroom that they had evidence that these jail phone calls existed. Well, there's no hearsay component as to Ms. Kulga calling, saying, hey, I'd like a bribe, give me $5,000, I'll take the heat, and your husband or your friend will go free. That's not hearsay. You're not arguing that, are you? Well, perhaps not. But what Mr. Manati's lawyer also said at the end of the day, I think is hearsay. And Kulga testified that Mr. Manati's lawyer told him, don't pay, screaming, don't pay. And that was, I was confused reading the brief, because it's hard to follow a bit. So Kulga is saying, on the tape apparently, who on the tape is saying, the lawyer's saying, don't pay? Who's the speaker of that comment? She says it was Vasily Buda. But we have a transcript, so we know who really said it, don't we? Who on a tape recording said it? I'm not entirely sure, Your Honor. I don't think that was ever tendered into evidence. Let me ask you about that statement, though. That strikes me as not being offered for the truth of the statement. I mean, what could be truthful about a statement that says, don't pay? Whether it's true or not doesn't make any difference. The important thing was that the statement was made, isn't it? It was. Our contention, though, is he also said, the lawyer apparently explained to Kulga, that you're going to end up, or that Mr. Manati's going to be in the same amount of trouble as you if he pays. I think that was the offer for the truth of the matter asserted, not just the don't pay part. These statements also weren't a part of... Because the attorney was concerned about the payment insofar it has affected him or in some other way. That's right. That it was bad for Mr. Manati from a legal standpoint. That's essentially what the lawyer is saying to Vasily Buda and... Payment which shows some acknowledgement of guilt. Right. Absolutely. The statements were also not part of any co-conspirator exception. This conspiracy ended back in April of 2013 when they were arrested at the airport, when Kulga... But if there's no hearsay component, we don't even have to worry about that. That's right. But on the conspiracy, to the extent that you have to get to that, obviously the immigration smuggling attempts done, but would you agree that if there had been a direct conversation with Ms. Kulga and your client to the effect directly... Let's put it another way. Your client, Mr. Manati, comes to her and says, I'd like to pay you $5,000. You take the rap. No hearsay to that, right? And that would be an admission of guilt, would it not? I think it would be, but Mr. Manati was not a part of these phone calls. But can't we not reasonably infer that with his wife and his friend, if the jury could infer that they were acting on his behalf and it was a proxy, almost as if he himself were saying an admission of guilt in a way, take the money and don't implicate me. I think you'd have to assume, though, that Vasily Budo and Mr. Manati's wife were a part of the charged conspiracy, which they were not. But it's not. At this point, we're not into a charged conspiracy. You can have a co-conspirator exception that's not part of a charged indictment, and would it not be a crime or a conspiracy to But again, these are not Mr. Manati's statements. These are people that he doesn't control. And he can't talk. He's in jail. These are people acting on his behalf, right? I suppose that would be the government's argument. Well, we run into these co-conspirator statements all the time in drug cases, and you don't have to know all the players. You don't even have to know much about the conspiracy as long as you know there's something wrong going on and you participate one time. You're a co-conspirator of a big overall smuggling conspiracy here. How can you say these are not co-conspirators? Well, I think what we have to look at is what the charged conspiracy was and when it ended. This may be some different conspiracy that he wasn't charged with. He wasn't notified under 404B of this prior bad act that they were trying to introduce. We're talking about something wholly removed from what he's been... As is famously said, it ain't over till it's over on a conspiracy. When is it over? But in Grunewald, the U.S. Supreme Court case, they said that when the primary purpose of the conspiracy has come to a close, that's it. That's when the conspiracy stops. In this case, the primary purpose was to get Daniel and Magellan into the country. That stopped when they were arrested at the Hartsfield Airport. Now, I wasn't sure. Did any money change hands eventually? What does the record say about that? Did she actually get money from Mrs. Minotti? She says that she was paid $5,000, but there was no record of that. Security procedures not being so great anymore or after she got out? There's no other evidence of that. No bank records, anything like that was introduced. So I don't know, Your Honor. And of course, this was harmful. Evidence coming in that my client had bribed the government star witness, of course, was harmful. It's an additional crime. It impugns his character. And you're saying the tape nor the transcript was ever introduced. That's right. But when you get down to it, then all of this, this allegation, everything, how do you pronounce her name? Kugla. Kugla, I believe. Kugla. Everything she said, it comes down to her credibility on all of this. And as she admitted, I'm a liar. I lie all the time. I'd do anything to stay in the country. So the jury could weigh that along with everything else, could they not? Well, that's the problem with the government's case is it all came down to the credibility of Kugla and Daniel. That's what their case really rested upon. So any error that comes in may very well be harmful. But the error relates to whether she's telling the truth about this latest fact. And so it's one more thing where you believe or you don't believe or you believe her sometimes. It's all her credibility. That's true. But you did say it only comes down to her credibility. And maybe I said that and that's too simplistic. There wasn't there lots of evidence tying her with telephone records to Menotti and he happens to be at the airport. And there's all sorts of circumstantial evidence tying him to this. Well, let's talk about that. So the airport, Mr. Menotti was at the airport the day that Daniel and Magellan landed in Atlanta. That's true. That was stipulated to the problem with that or what the government doesn't like to talk about is that Daniel's uncle called Mr. Menotti and asked him to come to the Well, there's testimony that Mr. Menotti helps people who come to this country. He helps other Albanians get established in their communities. So it's not uncommon for him to be calling other Albanians, both in America and in Albania, who wish to come to America. That certainly doesn't mean that he's trying to smuggle people in illegally. How about Ms. Kugel having his telephone number? Again, if he's trying to help people come to this country legally, it would make sense that he would be in contact with people who are trying to It doesn't mean that it has to be for unlawful purposes, though. But these telephone contacts between him and other Albanian citizens, I don't think that's suspicious. That's just one Albanian talking to another Albanian. Kugel also talked about text messages and Facebook messages between herself and Mr. Menotti and that Mr. Menotti would arrange all these things via text and Facebook message. But conveniently, she told the jury that she deleted all of those right before she was arrested. So there really wasn't any solid evidence linking Mr. Menotti to this alleged offense. What it was is the word of Kugel, the word of Daniel. And that's why these errors that we've named in our brief matter so much, because they serve to really bolster both Kugel's and Daniel's testimony. The other issue, of course, is that the district court limited cross-examination. And I'm running out of time, but I want to briefly raise this issue. Daniel had applied for asylum on a credible fear claim, and the immigration judge denied it. The immigration judge found him not to be credible. Trial counsel tried to cross-examine Daniel at trial on this point, that he was found to be not credible by the immigration judge. But the district court did not let him. We cited various cases in our brief. I believe there are circuit cases that said that this type of testimony is permissible under Rule 608B of the Federal Rules of Evidence. Don, our cases in Tyco, TIECO, and Jones indicate that this is not an appropriate thing to get into what a judge in another proceeding has said about something. Well, I think those cases are an opposite for a number of reasons. One, they don't address 608B. I think they look at judicial notice. One looks at public records exception. They're also civil cases. They're not criminal cases. So the Sixth Amendment, of course, is not implicated. In those cases, I think what's happening is the lawyers are trying to introduce extrinsic evidence, the actual documentary findings of the court. Here, all we're talking about is— To establish their truth and veracity. Right. Here, it's just cross-examination to test the veracity of a witness, not to establish a proven fact. That's right. It's just asking a question. And if the witness denies it, 608B says that you cannot follow up. Is this hearsay? Your Honor, I would argue no. I would argue no. The circuit courts that have dealt with this issue, at least the ones named in our brief, I know the government cited a Third Circuit case. The ones that you cite are not hearsay. That's our contention, yes. But is this statement hearsay? I would argue no. Under 608B, it would remove it from being hearsay. Doesn't it invade the purpose of the jury? The jury's going to hear, Daniel, they're going to hear a whole lot of things. They know he's trying to get asylum because he claims he's going to be persecuted back in Albania. They can believe or not believe him based on that. To go to what a judge in a different proceeding said, he thought about that without perhaps having the same evidence that judge has, isn't it— the judge's viewpoint for what the jury's actually supposed to be looking at, his credibility. Well, Your Honor, even if it were hearsay, which I don't think it is, the Sixth Amendment, I think, requires that he be allowed to ask that question. Because it goes to his credibility. It goes to his motives and biases. Well, let's point—I'm sorry. Go ahead, Judge Warren. If the opposite were true, could the testimony or the question be asked? I'm sorry? If the immigration judge had found him credible and the judge wanted to introduce that on direct examination of Daniel, would that have been permissible? I suppose—no, Your Honor. I don't think it would have been. Why not? Sixth Amendment talks about on cross-examination, inquiry into someone's truthfulness or untruthfulness. So if you—okay. So let me just flip it for you then. The government decides that Daniel is not that great of a witness. So they're not going to put him on. They think they're going to be able to get to the jury without his testimony. But he's here in the U.S. and you subpoena him and you put him on the stand on your direct and the government then crosses him. Can the government put in evidence or ask a question about the immigration judge having found him credible? That I don't know, Your Honor. I don't think that they would be able to. Same issue, right? Why not? I think we have to look at the text of Rule 608B, if that's how it's being admitted. I'm not sure that 608B would allow for that. But why not? Why does the text point one way when Mr. Menotti is doing the cross and another way when the government is doing the cross? That's a very good point, Your Honor. I just don't think the text, the plain language of 608B would allow it under that, perhaps under a different exception or rule. Okay, Mr. Johnson. You've saved your time for a rebuttal. Thank you very much. Thank you. Ms. Keene. Good morning. May it please the Court, Counsel. My name is Jennifer Keene and I represent the United States. Unless the Court has preferences, I'm going to begin where Mr. Johnson left off on the issue of the immigration judge's finding. It was not an abuse of discretion for the trial judge to limit cross-examination on the immigration judge's finding that Daniel Jura was not credible. Because as Judge Carnes, as you pointed out, this Court has held that there's a special danger that a jury would give undue weight to a judge's finding and that it would be unfair prejudice to admit the other judge's opinion under Federal Rule of Evidence 403. So this is a 403 balancing you're saying? Yes, Judge. And then this Court has held in two cases, two separate cases, not only Tieco but as should not import another judge's findings into the record of their case. I'm not sure you can say that that's what the judge based this decision on from the transcript though, can you? Based on the transcript, it's not clear. But I think that this Court could find based on 403 under right for any reason that it was not admissible for them, not allowable for them to cross on the immigration's finding of credibility. So we would perform a 403 balancing ourselves? I believe that it can be inferred that the trial judge made a 403 balancing as well. I'm not sure that that's right. But you cite a couple of cases in support of your position. But Jones, it seems to me, at least that case is very different, right? It is very. That case is where you're trying to introduce as a piece of historical fact, a judge's prior finding to establish the truth of that finding, right? Under judicial notice provisions. That's a very, very different situation than what you have here, right? Yes, Judge. It is a different situation in that it was a civil case and it was not about the other judge's credibility determination. But what that case highlights is that there's a danger of importing another judge's finding into a different case where there's a different fact finder and different legal issues, just as we have here. Is a reported decision like that hearsay? Yes, Judge. And I was going to point that out, the question that you posed to defense counsel. In Jones, this court held that the prior judge's order was hearsay and that it was not covered by exception under Rule 803 of public records. And as this court held in Tiego, it was- That's if you're introducing the ruling. The federal rules of evidence every once in a while give a lawyer the ability to ask a question, but then they're stuck with the answer to the question and they can't introduce extrinsic evidence to contradict the witness's answer. Yes, Judge. That's correct. Might this not be one of those scenarios? In other words, you may be able to ask the question, but if Daniel, for example, had said, nope, no immigration judge ever found me not credible. He loved me. And then the defense might have been stuck. And because of hearsay problems, they might not have been able to introduce the judge's written order substantively to contradict what Daniel said on the stand. But that doesn't mean the question can't be asked in the first place, right? Well, Judge, it's confided into the discretion of the trial court on whether that the question can be asked or not, and that it was not an abuse of discretion for him to not allow cross-examination, again, because the potential danger that the jury would give undue weight to that judge's finding. And now the cases that defense counsel cite to you, the out-of-circuit cases on Rule 60AB, which those other circuits have allowed cross-examination on another judge's finding, I would point out that this circuit, there is no case in this circuit on 60AB on whether cross would be allowed on another judge's finding and that this court's precedent in Tieco and Jones should control. But even those cases that defense counsel cite to you don't necessarily, those cases don't stand for the proposition that 60AB mandates that defense counsel be allowed to cross on another judge's finding. It just says that it does not bar cross-examination. But even in those cases don't necessarily— How close is a finding of not providing testimony credibly under oath to a perjury determination? I'm sorry, could you repeat that? How close do you think a judge's non-credibility finding is with regards to testimony under oath to a perjury determination? Well, I mean— If he had been convicted of perjury, he could have been crossed on that, right? If the government had chosen to prosecute him for the false testimony that he provided in front of the immigration judge under oath, right? He gets prosecuted for a false statement to a federal official in the course of his or her duties and he gets convicted, then that gets introduced, right? Yes, Your Honor, if he had been convicted— Correct. But in this case, he wasn't convicted and he wasn't charged and— I know, but my question is how close are those two things in terms of cross-examination? What's the difference between a judge finding you not credible under oath and a perjury conviction for having lied under oath? Well, in this case, it wasn't clear what the immigration judge found to be not credible. There's no evidence that—I mean, there's a distinction between finding someone not credible under oath and a perjury conviction for having lied under oath, but there's reasons why that they found they're not credible under different standards, going so far as to say that he outright lied. There may be pieces that he—that the immigration judge found not credible, but as a whole, we don't know that the judge actually felt that Daniel was outright lying and that's not clear from the immigration judge's ruling or on the record of this case. And so I think that those two are—can be very far apart, that someone can be found not credible and not go so far as to say that they're outright lying. Let me ask you about the confrontation clause aspect to this. You're relying on the United States v. Lyons out of this court, which says that if the jury—well, the test, it says, quoting, the test is whether a reasonable jury would have received a significantly different impression of the witness's credibility had counsel pursued the proposed line of cross-examination, end of the quotation. What are you really referring to with respect to the significantly different impression because there was no cross-examination allowed here at all? No, Judge, but I don't believe that there was a Sixth Amendment violation here because the jury heard all the same facts that the immigration judge heard. The jury heard about the blood feud. The jury heard about him lying to the immigration officials when he entered the country. But how is this different from, let's say, an expert chemist testifying in a drug case that this substance is cocaine but doesn't appear? The Supreme Court says that's a confrontation clause problem. What's different about this? I'm sorry, your analogy to— From a chemist saying, I find this to be cocaine. Well, I'm sorry. In the court's drug analogy, I'm assuming that the expert would be on the stand and the expert would be— No, the expert's not there. It's just a report. You can't introduce the report under the confrontation clause. Correct. Why is that different from this? Well, Daniel took the stand and he could have been cross-examined. Well, he was cross-examined. Yes, he was cross-examined. He was there. He testified and was cross-examined. He wasn't the judge who said, I find this witness not to be credible. He is the person that the judge found to be not credible. He didn't make the statement. No, and he didn't make the statement. And that, again, was hearsay. But— Correct me if I'm wrong, but I thought the judge ruled, and I'll read the transcript to you more carefully. The judge said, you can indicate you've talked about a blood feud and crossed Mr. Defense Attorney. You can point out that he had a hearing, the whole hearing, the solemn hearing was based on whether he feared persecution. You can point out the judge denied that. Am I wrong? I mean, that was the ruling. Was the defense attorney not allowed to bring out all of that? He just couldn't fill in the blanks with the particular editorial comments the immigration judge said in getting to his decision? No, Judge, you're absolutely right. Defense counsel was allowed to cross-examine on all of those issues. Not only was he allowed to cross-examine on all those issues, he ended up saying to the trial judge that's close enough and that that would have satisfied what he wanted to do on cross. He was allowed to cross-examine on everything but for the fact that the immigration judge found those particular facts to be not credible. So the jury was exposed to all the same facts that the immigration judge heard sufficient to draw their own inference of credibility as was in their province to make in this trial to make their own credibility determination. And so that plays into our harmless error argument that there's a reasonable probability that any error would not have affected this substantial, substantially affected the results in this case. And I think for my perspective, I think you've got a pretty decent argument on that point, but that's not the only evidence that's being challenged. And I'd like to talk to you, if I could, about a couple of the other pieces of evidence that are being challenged on appeal. Yes, Judge. Tell me a little bit about the admission of Lush's statement about what he did to bring Daniel, who was his cousin, into the United States. As I understand the brief, and I have not gone into the record to double and triple check everything, Archer told Lush that Mr. Manatti has helped him before, and I think he'll help you too. That's like two levels of hearsay, is it not? Yes, Judge. So how do you get that in? Well, Judge... This is Lush testifying about what Archer told him about what Mr. Manatti told him. So you tell me how you get that into evidence, if my construction of the statement is correct. Well, Judge, it's not hearsay because it was not offered for the truth of the matter asserted. Mr. Manatti helped me before, and I think he will help you too. You think that's not offered for the truth to show that Mr. Manatti is involved in alien smuggling? What other purpose could it have had? Well, the previous testimony leading up to that question, the previous testimony that Lush Jorah gave was that Archer gave him a phone number of an Albanian in Florida named Kelly. And then subsequently after that, then comes the question, and what did he tell you? Yes, that's the problem. If you had asked him whether or not somebody gave him a phone number, that's not hearsay. That's perfectly fine, but then you go further. The AUSA goes a step further. So I want to know how you get a statement about two levels of hearsay in. The statement was offered to explain why Lush, his subsequent course of conduct, then called that phone number. And in this court's case, Tokars, this court held that something offered to explain subsequent course of conduct is not hearsay. But you could have stopped with just saying he called the number. What did you do when he gave you the number? I called the number. And sometimes you got to stop at that, and you can't go further. And the subsequent testimony, yes, was that he called the phone number, he made agreement with the defendant for $24,000 to smuggle his nephew in, and that plays into. No, no. Well, again, that's why I want you to help me with the statement and tell me whether my construction of the statement from the briefs is right or wrong. As I understood the briefs, Lush testifies that he, that Archer told him that Mr. Manatti had helped Archer before. And I think he, Manatti, will help you too. Is that the statement? That is the statement. Okay. That, to me, that's two levels of hearsay, because it's Lush testifying about what Archer told him, and Archer's testifying about what Mr. Manatti told Archer, which he then relays to Lush. Well, I don't necessarily think that it's double hearsay. It's what Archer told Lush. That's one level of hearsay. But you don't have- Yeah, but what Archer told Lush is based on what Manatti told Archer. No, it's not based on what Mr. Manatti told Archer, but just what Mr. Manatti did for him previously. And there's- Okay. So tell me how that is not hearsay. One level of hearsay. That's where the truth of the... All of us have been trial judges. You don't introduce that statement unless you want it to help your case on guilt. I called Manatti, or I called a friend who talked to Manatti, and Manatti had helped him, and my friend told me, he'll help you too. What do you think that starts putting in the mind of the jury? That Manatti's involved in alien smuggling, right? Yes, Judge. And with the other subsequent witnesses, we then tie back, if the judge is not, if the court is not inclined to- That goes to the issue of harmlessness, and you may well prevail on that or many other theories in this case. But I want to know how that comes in. It's part of the charged conspiracy, Your Honor. Through the subsequent witnesses, we learn that the person that Archer was talking about, his sister, was smuggled in by Mr. Manatti and Ms. Kulga, and that was within the scope of the conspiracy. This conspiracy charge is starting in October of 2012, onward of smuggling Albanians into the country, and she was one of them, and that was in October of 2012. That's within the scope, the object, and the manner, and the means of this conspiracy. And the AUSA below argued a co-conspirator theory for admission of this when there was an objection, or argued course of conduct? She argued course of conduct at that time. At that time, Lush was the first witness, one of the first witnesses, and we had not gotten into tying back the sister being smuggled in into that statement at the time. So at the time, she argued course of conduct and not offered for the questions. I will conclude by saying that this court should affirm the trial judge's ruling on the evidentiary matters, and find that no errors were found, or the alternative that they were harmless errors. All right, thank you so much. Mr. Johnson. Thank you, Your Honor. With regard to Lush's testimony, one, no conspiracy existed at that time. There had been no agreement that had been established. Lush was feeling around, but nobody had agreed to do anything at this point. So I don't think that there is an established conspiracy to allow this in under the co-conspirator exception. Well, under the hearsay part, my notes indicate that the his course of conduct, why would he even be calling Mr. Minotti? Why? Because he's had somebody has given them this information. So it shows not necessarily that Minotti said the things he said, who knows, but it shows why Lush behaved the way he did, thinking that he might help him. That's what the judge said. Now, I don't think the judge gave an instruction to the jury that it should be limited for that purpose. My question is, I don't believe, but I could be wrong. Did the defense attorney ask the judge to give an instruction, making it clear that this was not admitted for the truth of the matter? No, Your Honor. I think defense counsel's position was that this was pure hearsay. Right. But then when a judge rules differently and says, no, I'm admitting it just to show course of conduct or to explain why Lush took the later action that he did, defense attorney could have said, judge, would you instruct the jury the purpose for which this is admitted? And I didn't think that he had. He did not. He did not. But he was not asked to. Your Honor, I'd like you to address your first claim on appeal, which is the prior consistent statements that were offered by the agents. You haven't addressed that, and I think that's probably your strongest claim, so maybe you ought to argue that. Yes, Your Honor. So during the trial, the government introduced Daniel's recorded interview to law enforcement, and during this interview, Daniel talks about how Mr. Minotti told him to go to Greece and set him up with Greek people who were going to make him fraudulent documents, and that Mr. Minotti was to be paid $23,000 for getting Daniel into the country. It's our contention that this was all hearsay, all of it. This was all not objected to, right? That's correct. If you read the transcript, apparently the government provided it to counsel either at the trial or shortly before the trial, and counsel had not had a time to review it. There's no objection. It's played. The entire video is about an hour long, and for the first 10 minutes, within that 10 minutes, there's a three or four-minute window where law enforcement is yelling at Daniel, do you want to be a witness or do you want to be a defendant, badgering him. In fact, one of the officers has to tell him to stop. Only after that does Daniel change his tune and spill the beans, so to speak, and point the statement to law enforcement the day before where he denied any other knowledge than who he was as a fake Greek citizen. How would Daniel have possibly known anything about Minotti who was not with him in Albania or Greece unless it were true? I mean, certainly he can make up things about Ms. Kugla, but if he's got Minotti's name and he knows Minotti and he's telling it whenever he's telling it, that's got to be some truth to that, doesn't it? Well, a couple of things on that. They had spent a couple of months together, Kugla and Daniel, preparing for this trip. They had produced fraudulent documentation, come up with fake stories. It wouldn't be that much of a stretch to say, hey, let's point the finger at somebody if we get caught. Also, Daniel admitted that he called his family that night to talk to them before the interview and that his family was also in touch with Kugla and Kugla's family, so there's a lot of different connections going on here. And Minotti just happens to be at the airport. He was at the airport because Daniel's uncle called him and asked him to come. That's why he was there, according to the testimony. And Daniel's sister testified that he was there to welcome Daniel to the country. And again, that's corroborated by the fact that he had character witnesses who talked about Minotti was a large figure in the Albanian community and helped to get people established once they're here. But we have this minutes. And this had the effect of bolstering Daniel's testimony at trial. Well, let me ask you, as a matter of law, the government's relying on the Prieto decision. How would you distinguish that case from this? No, Prieto said there is no bright line rule, that there has to be a motive to lie if it's going to be a prior consistent statement. Here, that motive to lie existed as soon as law enforcement started yelling at Daniel, do you want to be a witness or do you want to be a defendant? Do you want to be prosecuted? We also have to look at the circumstances of it. He had lied before the day before to law enforcement. He admitted to that. Now he changes his story and tells an entirely different story. So if a motive to lie didn't exist at the time. The jury was made aware of that, though. They were. But it doesn't make that this statement admissible. And the judge was fully aware of it when he. Yes, Your Honor. Let me ask you one more question on that. And Ms. Keene, since this was brought up in the rebuttal, I'll give you a chance to respond. You you also say that there was plain error with regards to the admission of another prior statement by Ms. Kulga. But I really couldn't figure out from the briefs what that prior statement was. There was evidence and testimony that she had lied to the CPB officials at the airport. But I don't know what other statement you claim constituted plain error of hers. She told law enforcement that she was meeting Kelly at the airport. And that she gave law enforcement Kelly's phone number. Those were the statements that we had complained of. And they are not nearly as extensive as Daniel's. That's why. When when was that statement made? This the second day during the second interview. She again, she said that she was meeting Kelly, which was Mr. Manati. That's right.  She provided his phone number. And it turned out to be his phone number, correct? No question that the number she gave was, in fact, his telephone number. I don't believe that was ever stipulated, too. All right. Thank you very much. Can you give her three minutes, please, Tony? Three. So if you'd like to respond to the argument concerning the admission of Daniel's prior statement and maybe Miss Kougas, too, you can go ahead, Miss Keene. Thank you, Your Honor. As this court found in Prieto, there can be multiple motivations to lie as well as multiple motivations to tell the truth. And there were sufficient facts for the trial judge to find that the motive to lie didn't attach until those two witnesses agreed to operate or offered immunity later in the case and that they were motivated. They could have been motivated to curry favor with the government as far as their immigration issues were concerned. Both prior statements were made on May 1st of 2013. And the jury heard evidence that in that second statement, the second statement that Defense Counsel raises on appeal and objects to, that immediately prior to making that second statement, Daniel talked to his family and Daniel, he said, you know, I talked to my family and asked, what should I do? And his family told him to tell the truth, to stay strong and tell the truth. And that's why he gave the second statement that he gave. When does the motive viewed at? At what point do you look at motive for him? In Exhibit 53, the government gave Daniel a deferred action letter on August the 15th of 2014 and stated that, you know, if you testify for the government, if you help us out, we'll let you stay for a year. And I think that's when the motive to lie or motive to curry favor with the government attached. That's when he was first offered any benefit whatsoever from the government. And with Kulga, similarly, she testified that the statements, the second statement that she gave May 1st of 2013, she stated that that's when Special Agent Martin Katz came to see her. And he was the only one that was forthright, truthful and up front with her and that she basically respected that. And that's why she started telling him the truth in that second statement. And she was but she was ultimately prosecuted. So when did her motive arise? She was ordered to be deported on March the 11th of 2014. That was entered into evidence as Exhibit 56. And she subsequently had a meeting with the United States Attorney's Office in July of 2014 about her testifying. At that point, when she was ordered deported, she knew that she was about to have to leave the country. She wanted to stay and she saw an opportunity to curry favor with the government. And as the jury heard that the government was willing to tell the immigration judge that she testified and she assisted the government. So I think she saw that opportunity after she was ordered to be deported when she lost all avenues of relief in immigration court and was asked to subsequently testify in July of 2014. And based on those facts, I think there was sufficient facts that the motive delight didn't attach until later. But at any rate. Why? I don't understand that. I don't understand. You're almost saying that everything she tells the government after she wants to curry favor is a prior consistent statement. Is that what you're saying? I think that the court's determination of when a motive to lie attaches is very fact specific. And there are facts for the court to have found that that's when the motive to lie could have attached. But the trial court didn't get the opportunity to make that determination because defense counsel didn't object below. And so this court is left to think about what the district court would have would not have found on a very fact intensive inquiry. And so defense cannot meet their burden to show that any error affected the substantial rights or that it affected the fairness, integrity, or public reputation in the judicial process. But I'm saying is that. Yes, the trial court didn't get to make this below. There were sufficient facts to find that the motive to attack lie attached later and not necessarily before. And this court has found in Prieto and Chavers in similar situations that the motive to lie could have attached later down the line when a benefit was offered to the co-conspirator as opposed to at arrest. All right. Thank you very much, Miss Keene. Mr. Johnson, we know you were court appointed and we want to thank you for your service to the court and to Mr. Minotti. We really appreciate it. Thank you.